# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT WINCHESTER

BLAKE CRETACCI,                          )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )        No.:        4:19-CV-55-SKL
                                         )
MATTHEW HARE, et al.,                    )
                                         )
                    Defendants.          )

## MEMORANDUM AND ORDER

Coffee County, Tennessee ("Coffee County" or "County") and Matthew Hare, Tristan Collins, Steven Austin Qualls, Joshua Henry Thomas, and Cody Duke ("Officer Defendants") have filed motions for summary judgment [Docs. 37 and 38] in this prisoner's civil rights action for violation of 42 U.S.C. § 1983. Plaintiff has filed responses opposing the motions [Docs. 43 and 44], and Defendants have filed replies thereto [Docs. 49 and 50]. This matter is now ripe. For the reasons set forth herein, the Court finds that summary judgment should be **GRANTED** as to Coffee County and **DENIED** as to the Officer Defendants.[1]

## I.    ALLEGATIONS OF PARTIES

### A.    Undisputed Facts

On August 18, 2018, Plaintiff, a pretrial detainee housed at the Coffee County Jail, was accused of damaging the inside of his cell and was ordered moved to a cell in a higher security area [*See* Doc. 43-1 ¶ 1; Doc. 44-6 p. 6-7; Doc. 44-19 p. 6; Doc. 44-20 p. 7-8]. Plaintiff asserted his innocence and initially refused to move, but he eventually decided to cooperate and voluntarily

---

[1] Also pending is Plaintiff's motion against Coffee County for spoilation of video evidence [Doc. 40]. The Court will address that motion by separate order.

left the cell [Doc. 43-1 ¶ 1; Doc. 44-6 p. 6-8]. Officers Hare, Collins, Qualls, Thomas, and Duke began to escort Plaintiff, unrestrained, to the maximum-security unit [*See, e.g.,* Doc. 44-20 p. 40]. An altercation occurred during the escort, and Plaintiff was taken to the ground and placed in handcuffs [*See, e.g.*, Doc. 43-1; Doc. 44-20 p. 40; Doc. 44-20 p. 8]. Plaintiff was also tasered during the incident [Doc. 43-1 ¶ 6; Doc. 44-6 p. 9-14; Doc. 44-15 p. 6-7; Doc. 44-19 p. 7-8; Doc. 44-20].

### B. Plaintiff's Allegations

Plaintiff maintains that while he was being escorted to his new cell, Officer Hare shoved him "for no apparent reason," which Plaintiff "shrugged" off [Doc. 43-1 ¶ 2]. Officer Hare then shoved Plaintiff a second time, at which point Officers Collins, Duke, Qualls, Hare, and Thomas "jumped" Plaintiff [*Id*. at ¶¶ 3-4]. Officer Collins placed Plaintiff on the ground in a choke hold, and Officer Qualls tasered him "multiple times" while Officers Duke and Hare twisted Plaintiff's arms [*Id*. at ¶¶ 5-7]. Officer Thomas held Plaintiff down by the legs during the incident [*Id*. at ¶ 8]. Plaintiff asserts that he was compliant and nonresistant at the time this take down occurred, and that he "was roughed up by the officers for no reason." [*Id*. at ¶¶ 9-10].

After Plaintiff was handcuffed, he was taken to his new cell, where Officer Hare ordered Plaintiff to get on his knees [*Id*. at ¶ 12]. When Plaintiff asked how he was supposed to get on his knees while handcuffed, Officer Hare shoved Plaintiff forward [*Id*. at ¶¶ 12-13]. Plaintiff was forcefully thrown to the ground and hit his head, rendering him dazed and/or unconscious [*Id*. at ¶ 13]. Plaintiff does not know what happened next, but when he awoke, he was "sore all over" [*Id*. at ¶ 14].

Plaintiff filed a grievance about the assault, but no one interviewed him about his complaint or performed any investigation into it [Doc. 1 p. 4]. In that grievance, Plaintiff specifically requested that the surveillance video be preserved [*Id.*]. On September 15, 2018, Plaintiff's

attorney formally requested the video, and the certified letter containing the request was received by the Sheriff's Department on September 17, 2018 [*Id.*]. Non-certified copies were sent to Jail Chief Deputy Frank Watkins, and to County Attorney Robert Huskey [*Id.*]. The video was not preserved [*Id.*].

Citing a number of different incidents involving the use of force at the Coffee County Detention Center, Plaintiff alleges that the Coffee County Sheriff's Department has a custom of ignoring grievances about guard misconduct and failing to discipline its officers for such misconduct [*Id.* at 5]. He maintains that none of the Officer Defendants were ever disciplined as a result of incident in this case [*Id.* at 4].

On August 16, 2019, Plaintiff filed the instant complaint against Matthew Hare, Tristan Collins, Steven Austin Qualls, Joshua Henry Thomas, and Cody Duke, alleging that they employed excessive force against him, in violation of the Fourteenth Amendment [Doc. 1 at 9]. He also claims that Coffee County is liable for the officers' misconduct under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), because: (1) the leadership was aware of Defendants Hare and Collins' predilection for assaulting inmates, failed to restrain them, and ratified their conduct after the fact; and (2) "on a more general level," the leadership fails to train and supervise the guards to prevent such violence [Doc. 1 at 9].

### C. Defendants' Allegations

#### 1. Officer Defendants

The Defendants tell a markedly different story of what happened after Plaintiff exited the damaged cell. They maintain that while escorting Plaintiff to a maximum-security cell, Officer Hare placed his hand on Plaintiff's back or shoulder [*See, e.g.*, Doc. 44-15 p. 6-7; Doc. 44-20 p. 11, 40]. Plaintiff attempted to hit Officer Hare, without making contact [*See, e.g.*, Doc. 44-15 p. 6-7; Doc. 44-20 p. 40]. Officer Thomas then attempted to restrain Plaintiff, but Plaintiff pulled

3

away [Doc. 44-15 p. 6-7]. Thereafter, Officer Qualls shouted, "tazer, tazer, tazer" before drive stunning[2] Plaintiff "for a very short amount of time" [Doc. 44-15 p. 7, 9; *see also* Doc. 44-19 p. 8; Doc. 44-20 p. 8, 40]. Officer Collins then took Plaintiff to the ground, and Officer Duke placed Plaintiff in handcuffs [Doc. 44-6 p. 14-16; Doc. 44-19 p. 9; Doc. 44-20 p. 40]. Plaintiff was escorted to the new cell [Doc. 44-20 p. 8, 40].

Upon reaching the maximum-security cell, Hare asked Plaintiff to get on the ground so that the restraints could be removed, but Plaintiff refused and attempted to pull away from officers [Doc. 44-20 p. 8, 40]. Plaintiff was placed on his knees, laid forward, his ankles were crossed, and his handcuffs were removed [Doc. 44-20 p. 8, 40]. The officers exited and shut the door, at which point Plaintiff came up to the door and started yelling [Doc. 44-6 p. 23-25]. Plaintiff did not appear injured at the time [Doc. 44-6 p. 29-30]. Plaintiff continued his exercise routine of doing push-ups and sit-ups after the incident [Doc. 44-19 p. 30-31]. The Officer Defendants maintain that Plaintiff was subjected to a routine take down and restraint after being resistant and aggressive with officers, and the force used to subdue him was not excessive [*See, generally*, Docs. 44-6; 44-15; 44-19; 44-20].

### 2. Coffee County

The County maintains that no constitutional violation occurred in this case, and therefore, it bears no liability in this matter [Doc. 39 p. 3]. It otherwise argues that the County (1) does not have an illegal official policy; (2) did not ratify the officers' actions in the other incidents of alleged excessive force offered by Plaintiff; and (3) does not employ inadequately trained officers [Doc.

---

[2] A "drive stun" occurs "where the TASER device is held against the target without firing the projectiles and without incapacitating the target." *See* "Taser," Wikipedia, https://en.wikipedia.org/wiki/Taser#Drive_Stun_capability (follow "Drive Stun capability" hyperlink) (last accessed December 10, 2020).

4

39 p. 3-6]. The County additionally argues that, even if the record arguably shows inadequate training, the separate instances of alleged illegal activity do not support a claim that the County was deliberately indifferent to the need for training [Doc. 39 p. 6-9].

The County notes that its officers "are trained and certified on the use of force in accordance with and above" standards of the Tennessee Corrections Institute ("TCI") standards [Doc. 38-1 ¶ 5]. All corrections officers are supervised by higher ranking officers who oversee and direct compliance with the policies of TCI and Coffee County Sheriff's Department [*Id.* at ¶ 6]. Coffee County maintains there is no policy or custom of ignoring grievances or allegations of excessive force, and it denies disregarding any pattern of such force by its officers [*see generally* Doc. 38-1].

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when the pleadings and evidence, viewed in a light most favorable to the nonmoving party, illustrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is deemed "material" if resolving that fact in favor of one party "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To establish an entitlement to summary judgment, the moving party must demonstrate that the nonmoving party cannot establish an essential element of his case for which he bears the ultimate burden of proof at trial. *Celotex*, 477 U.S. at 322; *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993) (citations omitted).

Once the motion is properly supported, the nonmovant must show that summary judgment is inappropriate by setting forth specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 323; *Anderson*, 477 U.S. at 249. If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," then there is a genuine dispute as to a material fact.

*Anderson*, 477 U.S. at 248. If no proof is presented, however, the Court does not presume that the nonmovant "could or would prove the necessary facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 888 (1990)).

The very purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine issue for trial." Advisory Committee Note to the 1963 Amendments to Rule 56. Indeed, "[t]he amendment is not intended to derogate from the solemnity of the pleadings[;] [r]ather, it recognizes that despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary." *Id.* The non-moving party (Plaintiff in this case), must come forward with proof to support each element of his claim. Plaintiff cannot meet this burden with "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), "conclusory allegations," *Lujan*, 497 U.S. at 888, or by a mere "scintilla" of evidence, *Anderson*, 477 U.S. at 252. It would undermine the purposes of summary judgment if a party could defeat such a motion simply by "replac[ing] conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan*, 497 U.S. at 888. Therefore, in considering a motion for summary judgment, a court must determine whether the non-moving party's allegations are *plausible*. *Matsushita,* 475 U.S. at 586-87 (emphasis added).

In considering a motion for summary judgment, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, . . . [the ultimate decision becomes]. . . a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis in original). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on the motion for summary judgment." *Id.* at 380.

6

### III. ANALYSIS

#### A. Officer Defendants

##### 1. Legal Standard

In order to demonstrate liability under § 1983 as to any defendant, a plaintiff must first establish that the defendant acted under color of state law, and that his actions violated the rights secured by the Constitution and/or laws of the United States. *See, e.g., Baker v. McCollan*, 443 U.S. 137, 140 (1979). The plaintiff must also make a clear showing that the particular defendant was personally involved in the activity that forms the basis of the complaint. *See Rizzo v. Goode*, 423 U.S. 362, 377 (1976).

Defendants have pled the defense of qualified immunity as to the allegations against them. Qualified immunity protects governmental employees from individual, civil liability as long as their conduct does not violate clearly established "constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). An evaluation of qualified immunity requires the Court to conduct a three-pronged inquiry: (1) whether there was a constitutional violation; (2) whether the violated right was "clearly-established;" and (3) whether the official's actions were objectively unreasonable. *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6th Cir. 1996)). The Court may address these prongs in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

For a right to be clearly established, "at the time of the officer's conduct, the law [must have been] sufficiently clear such that 'every reasonable official would understand what he is doing is unlawful.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (other quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Thus, once qualified immunity has been pleaded by a defendant, the plaintiff bears the burden of rebutting the defense by showing

both "that the challenged conduct violated a constitutional or statutory right, and that the right was so clearly established at the time of the conduct 'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014) (quoting *Ashcroft*, 563 U.S. at 741).

The Fourteenth Amendment provides the law governing the Court's analysis in this case. A pretrial detainee's Fourteenth Amendment right to be free from excessive force is violated upon demonstration that "the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015). "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). A court must judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene," rather than with "the 20/20 vision of hindsight." *Id.*

Some appropriate considerations for whether force is objectively reasonable include: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* (citation omitted). Consideration must also be given to the "legitimate interests" of jail officials in managing the facility, which requires deference to policies and practices that, in the judgment of such officials, "are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)) (quotation marks omitted).

The Officer Defendants argue that Plaintiff has failed to present any evidence from which a jury could reasonably find for him, as he has only presented the Court with his own self-serving testimony, which the Officer Defendants maintain is "totally discredited by the testimonies of each

of the defendant officers to the point that no reasonable jury could believe it" [Doc. 37 p. 15; *see also, generally*, Docs. 37 and 49]. They maintain that any force used against Plaintiff was reasonable and in response to his aggressiveness and resistance [Doc. 37 p. 11-12]. Conversely, Plaintiff argues that he was attacked by officers while complying with officers' commands, presumably for "mouthing off" earlier and initially refusing to comply. Given that the parties each dispute the other's version of events, the Court cannot determine the reasonableness of the use of force in this case without making a credibility determination. Accordingly, the disputed facts require the Court to have a jury resolve these issues.

Defendants assert that Plaintiff's claims are otherwise too conclusory to support liability against them, as Plaintiff concedes that "[he] cannot say exactly who did what during this incident," and that he "was generally roughed up by the officers for no reason" [Doc. 43-1 ¶ 9]. It is true that Plaintiff's declaration makes that concession. However, in the paragraphs that follow, Plaintiff specifically asserts that while he was not actively resisting or being combative, Officer Hare shoved him and later slammed him face-first onto the ground; Officer Collins took him to the ground in a choke hold; Officer Qualls tased him "multiple times"; Officers Duke and Hare grabbed and twisted his arms; and Officer Thomas grabbed his legs and held him down. If Plaintiff's account is believed, these unnecessary acts of violence violate the Fourteenth Amendment. *See, e.g. Coley v. Lucas Cnty.*, 799 F.3d 530, 539 (6th Cir. 2015) (holding "where an arrestee poses no threat to others and is not trying to escape, an 'unprovoked and unnecessary blow'" violates the right to be free from excessive force); *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) ("[W]hen we have found excessive force [in use of a Taser], the suspects were compliant or had stopped resisting." (citing cases)).

The Officer Defendants additionally argue that there is no objective evidence to support Plaintiff's allegations [Doc. 37 p. 15]. Defendants rely on *Scott v. Harris*, 550 U.S. 372, 380

9

(2007), in which the Supreme Court determined that the district court was not required to credit a plaintiff's version of events if the events are directly contradicted by objective evidence (in that case, a video). Here, however, there is no such evidence. Moreover, the record is clear that Plaintiff and his attorney separately requested that any video evidence of this incident be preserved, but the video was not preserved. Instead, the Court has been presented with Plaintiff's word against Defendants. Because Defendants have not produced evidence objectively discrediting Plaintiff's version, it must be credited. *See, e.g., Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 538 (6th Cir. 2018) (holding where evidence "does not blatantly contradict [plaintiff's] sworn testimony . . . his testimony *must* be credited at summary judgment (emphasis in original)); *Gholston v. Wayne Cnty. Airport Auth.*, 574 App'x 632, 637 (6th Cir. 2014) ("But *Scott* is applicable only if there are objective facts in the record, such as a video, showing that one party's account is simply beyond belief." (citations omitted)).

The Officer Defendants also cite the deposition of Nurse Lynn Carter to support its argument that Plaintiff has failed to produce any objective evidence of injury from the alleged assaults. However, the Officer Defendants have failed to supply her testimony (or, in fact, any testimony or proof at all) in support of their motion.[3] Regardless, Plaintiff asserts that he was beaten without provocation, rendering him unconscious or dazed, from which he awoke "sore all over" [Doc. 43-1]. Because this Court's focus is on the "nature of force rather than the extent of injury," Defendants cannot defeat this claim merely because Plaintiff "had the good fortune to escape without serious injury." *Wilkins v. Gaddy*, 559 U.S. 34, 34, 38 (2010).

---

[3] The depositions relied upon by the Court in this Memorandum and Order were filed by counsel for Plaintiff in his response to the County's motion for summary judgment [*See, e.g.*, Doc. 44].

Therefore, the Court finds that the Officer Defendants' motion relies upon subjective, disputed evidence, which precludes the entry of summary judgment in this cause as to the Officer Defendants. Accordingly, their motion for summary judgment [Doc. 37] will be **DENIED**.

### B. Coffee County

It is well settled law that a municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). However, a local governmental unit may be liable for civil damages in a § 1983 action when the execution of a governmental policy or the toleration of a custom causes the deprivation of a constitutionally protected right. *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell*, 436 U.S. at 691).

A policy or custom may be established by demonstrating:

(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citation omitted).

In this case, Plaintiff does not appear to rely on the first theory of liability, as he does not argue that an illegal official policy or legislative enactment caused the violation of his constitutional rights. Therefore, the Court will not address this theory but will turn to the remaining theories of liability to assess Coffee County's motion.

### 1. Custom of Tolerance or Inaction

Plaintiff contends that Coffee County has repeatedly failed to investigate or discipline officers for alleged violations of federal rights [Doc. 44]. He also maintains that "the County has admitted that it did not have any system at all to investigate excessive force" [*Id.* at p. 7-8]. To hold Coffee County liable for having a custom of inaction, Plaintiff must demonstrate (1) a

11

clear and persistent pattern of constitutional violations; (2) notice, or constructive notice of such pattern to the governmental entity; (3) tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act amounts to an official policy of inaction; and (4) that the custom or policy of inaction was the "moving force" behind the constitutional injury. *Garretson v. City. of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005). The "deliberate indifference" in this context is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id*. at 795 (citation omitted). This standard requires "multiple earlier inadequate investigations" of "comparable claims." *Pineda v. Hamilton Cnty*., 977 F.3d 483, 495 (6th Cir. 2020) (citation omitted).

### a. Comparable Claims

In response to Coffee County's motion for summary judgment, Plaintiff relies on nine separate incidents to support his claim that numerous instances of alleged excessive force demonstrate that prisoners' claims went "unpunished and uninvestigated" [Doc. 44 p. 7-8 (identifying incidents occurring on September 29, 2015; October 5, 2016; January 14, 2017; February 7, 2017; August 10, 2017; August 29, 2017; September 15, 2017; March 27, 2018; and October 8, 2018)]. The Court will address each of these incidents, though not in chronological order.

First, in *Allsopp v. Foust*, No. 4:17-cv-41-CHS, Doc. 96 p. 11 (E.D. Tenn. August 5, 2020), this Court described the September 29, 2015 incident as a "riot," and a "scene of complete chaos in the moments leading up to the guards' entry." In assessing inmate Allsopp's claim for *Monell* liability against Coffee County, the Court found the riot was too factually dissimilar to the incident underlying inmate Allsopp's claim, which the Court described as "unprompted escalation" by the guard. *Id.* at p. 12. The same is no less true here; an officer's response to a riot is too factually

12

dissimilar to the assault alleged in the instant complaint, such that the two incidents cannot be said to be part of the same "clear and persistent pattern" of unconstitutional conduct.

Second, this Court also previously addressed the January 14, 2017 incident between Officer Foust and Plaintiff, and concluded that the force used by Officer Foust was not constitutionally excessive. *Cretacci v. Call*, No. 4:16-cv-97-CHS, Doc. 74 p. 26 (E.D. Tenn. May 20, 2020) *appealed*, No. 20-5669 (6th Cir. June 19, 2020) (oral argument held January 12, 2021). Moreover, that incident is likewise too factually dissimilar from the allegedly unprompted attack here to establish *Monell* liability. *See Allsopp*, No. 4:17-cv-41-CHS, Doc. 96 p. 12-13. Officer Foust was responding to a threat that another inmate had a weapon and planned to stab someone. All of the inmates in the area were ordered to get down, so that officers could quickly prevent violence and search for the weapon. Officer Foust had a reasonable belief Plaintiff was refusing to obey that order. By contrast, in this case, there was no threat of a weapon, and Plaintiff claims to have been fully cooperative when he was assaulted.

Third, no complaints regarding the use of force were made after the August 10, 2017 and September 15, 2017 incidents, and therefore, Plaintiff has failed to present any evidence from which this Court could find that the County should have been on notice that these incidents involved unconstitutional actions. *See, e.g., Loy v. Sexton*, 132 F. App'x 624, 627 n.6 (6th Cir. May 23, 2005) (noting municipality bears no responsibility to investigate a use of force merely because it occurred), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). The jail incident reports Plaintiff submitted indicate that the inmates involved were taken to the ground and restrained after refusing to comply with orders from Officer Hare [Docs. 44-11 and 44-16]. Plaintiff does not explain what about these incident reports gives a "'strong' indication of unconstitutional conduct." *Id.* at 627 (quoting *Doe v. City of Roseville*, 296 F.3d 431, 439 (6th Cir. 2002)) (holding that supervisor could not be liable under § 1983 for failing to investigate use of

13

force when report about incident did not contain a "'strong' indication" officer used excessive force).

Fourth, regarding the March 27, 2018 incident, the evidence demonstrates Officer Hare was found by his supervisors to have used excessive force against inmate Pruitt, and that Officer Hare was disciplined. Plaintiff argues the discipline was "minor" because Officer Hare testified, in a deposition conducted over two and half years later, that he could not recall ever having been disciplined for his conduct as an officer at the jail. The record does not support Plaintiff's interpretation. The disciplinary report indicates the punishment would have been 48 hours—four days off work—but was reduced because it was Officer Hare's first offense. Officer Hare was also ordered to receive additional training in the use of force, de-escalation, and report writing [Doc. 44-17]. It appears he was punished quickly and in accordance with the written procedures for the Coffee County Sheriff's Department, which Plaintiff does not challenge in this lawsuit. Accordingly, this instance does not support Plaintiff's claim that the County had a custom of inaction regarding complaints of officer conduct, or a tolerance of the use of excessive force.

Fifth, the Court notes that the October 8, 2018 incident occurred after the events at issue in this case. It therefore cannot be part of a pattern of illegal activity which gave notice to the County that Plaintiff's constitutional rights were in danger of being violated.[4] *See Meirs v. Ottawa* Cnty, 821 F. App'x 445, 453-54 (6th Cir. 2020) ("A similar situation after the fact, however, does not create a pattern to show that the County was on notice at the time of the event in question."). Moreover, Plaintiff himself concedes that the Sheriff "did respond appropriately to this guard's misconduct." [Doc. 44-22 p. 3]. Finally, Plaintiff characterizes the *Jacobs* offer of judgment as indicating that the "County was found liable for excessive force based on *Monell* liability for

---

[4] This reasoning also applies to the August 2018 assault at issue in this case.

inadequate supervision." [Doc. 44 p. 8]. The Court disagrees. The County was not "found liable" by a factfinder; rather, it made an offer of judgment to resolve the case. It could have done so for any number of reasons apart from admitting liability.

The Court finds that the remaining incidents — those occurring on October 5, 2016; February 7, 2017; and August 29, 2017 — do appear similar to the incident at issue in this lawsuit. Coffee County does not argue otherwise.

Regarding the October 5, 2016 incident, Plaintiff submitted a copy of the grievance filed at the jail by inmate Doug Christian [Doc. 44-5]. The grievance states that, while inmate Christian was undressing, Officer Sharp pushed his head down, and Officer Collins "grabbed" his right arm and pushed him down, and he "felt something pop" in his neck and his right arm went numb [*Id.*]. Plaintiff contends that the grievance "shows that it was never answered" [Doc. 44 p. 4], perhaps referring to the fact that the sections titled "Admin Notes" and "Notes to Inmate" are both left blank, and the "Status" section is labeled "New." Plaintiff also submitted testimony from Officer Collins indicating that "to [his] knowledge," he has never been investigated at the Coffee County Jail for excessive use of force [Doc. 44-6 p. 30].

In its reply, Coffee County submitted a declaration from Chief Deputy Frank Watkins. The declaration states that the "lack of a documented response to an inmate grievance does not mean that the allegation of misconduct was not investigated," and that "just because an officer is unaware of an investigation into his use of force, does not mean that one did not take place." [Doc. 50-1 p. 2, ¶¶ 8-9]. Chief Deputy Watkins does not affirmatively indicate whether the incident (or any other incident at issue in this case) was actually investigated, however.

To survive summary judgment, Plaintiff "must present enough evidence to allow a reasonable juror to conclude that [his] position more likely than not is true." *Pineda*, 977 F.3d at 491 (quotation marks and citation omitted). The Court agrees with the County that the record

15

reveals very little information about this particular incident and how it was handled. *See Roberts v. Coffee Cnty.*, 826 F. App'x 549, 558 (6th Cir. 2020) (reasoning that specified incidents are not helpful to prove *Monell* liability in part because "there is no evidence in the record about how the County responded to any of these incidents"). Nevertheless, it is unnecessary for the Court to determine whether Plaintiff's evidence is sufficient at this stage to show this alleged use of excessive force occurred, and if so, whether it was adequately investigated.[5] As explained below, even including this incident, the Court finds Plaintiff has failed to show a persistent pattern of prior violations sufficient to allow his *Monell* claim to survive summary judgment.

The August 29, 2017 incident occurred between Officer Hare and inmate Allsopp—Officer Hare took inmate Allsopp to the ground by grabbing him from behind and forcing him down. Plaintiff submitted a copy of the related grievances filed at the jail by inmate Allsopp [Doc. 44-14], a copy of the jail incident report [Doc. 44-13], Allsopp's deposition testimony [Doc. 44-12], and a video of the incident [*see* Doc. 48]. Plaintiff also cites to Officer Hare's testimony that, "other than being advised in a training manner," he could not remember ever having been investigated for misconduct [Docs. 44 p. 5 and 44-15 p. 47-48]. Coffee County again relies on Chief Deputy Watkins' affidavit, arguing essentially that Plaintiff cannot show the August 29, 2017 incident was not investigated.

The County's position on the August 29, 2017 incident does not address Plaintiff's assertion that the County also failed to properly discipline officers who used excessive force. In a grievance dated September 2, 2017, inmate Allsopp writes, "Why is Officer Hare still coming into BB pod after he assaulted me for no reason, I do not want that psycho anywhere around me" [Doc. 44-14 p. 1]. The grievance indicates it was "Resolved Substantiated," by "Corporal Hegwood."

---

[5] Neither party challenges the admissibility of any of the exhibits.

The Admin Notes section states, "I have made Deputy Matthew Hare the B-Supervisor to fix the disrespect and misuse of our facilities by the inmates and officers." [*Id.*]. If inmate Allsopp's grievance was substantiated, it is hard to see how making Officer Hare a supervisor constitutes an adequate response by Corporal Hegwood. The next grievance from inmate Allsopp, dated September 22, 2017, states: "This matter was never resolved I said I did not want Hare around me. This officer assaulted me for no reason and he is still coming into BB pod. Keep this man away from me." Again, this grievance indicates it was "Resolved Substantiated" by Corporal Hegwood, but the Admin Notes state: "Inmates should not get to decide what officers work the units." [*Id.* at p. 2].

The February 7, 2017 incident occurred between inmate Allsopp and Officer Foust. Plaintiff alleges inmate Allsopp was "choked, slammed into a wall, and slammed onto the floor." [Doc. 44 p. 4]. There are a number of grievances in the record related to this incident [Doc. 44-10]. Several indicate a status of "In Progress." One indicates it was "Resolved Substantiated," and another one indicates it was "Resolved Unsubstantiated"; both allege Officer Foust assaulted inmate Allsopp on February 7, 2017 [*Id.* at p. 5]. The County does not rely on the Watkins affidavit regarding the February 2017 incident. Instead, the County emphasizes that, in the lawsuit arising from the February 2017 incident (*Allsopp v. Foust*, No. 4:16-cv-41-CHS), the Court determined that *Monell* liability was inappropriate in part because inmate Allsopp could not show a persistent pattern of illegal activity. This argument misses the mark. That *Monell* liability was inappropriate in *Allsopp v. Foust* does not mean the February 2017 incident cannot be part of a persistent pattern of violations to support *Monell* liability in this case. Inmate Allsopp's excessive force claim against the officers arising from the February 2017 incident remains pending in that case, with a trial date set for May 2021.

Nevertheless, the Court finds these three incidents are insufficient to establish a persistent pattern of earlier violations sufficient to show the type of deliberate indifference necessary for proving the County tolerated or had a custom of inaction regarding the use of excessive force. First, as noted, there is very scant proof about the October 2016 incident and whether/how it was addressed.  Second, while a video of the February 2017 incident was not produced (like in this case), the jail did produce a video of the August 2017 incident (and the September 2015 riot). Third, each incident is separated by a period of several months, and the latest incident occurred more than one year before the incident at issue in this case.  Fourth, Plaintiff acknowledges that when an assault occurred in front of the "Jail Captain himself," Officer Hare was punished [Doc. 44 p. 8 (referring to the March 2018 incident)].  These facts simply do not show the County had a custom of permitting the use of excessive force that was "so widespread, permanent, and well settled as to have the force of law"; nor do these facts show that using excessive force on cooperating inmates was a "deeply embedded traditional way[] of carrying out" jail policy. *Cash v. Hamilton Cnty. Dep't of Adult Prob.*, 388 F.3d 539, 543 (6th Cir. 2004) (citation omitted); *see also Stone v. City of Grand Junction*, 765 F. Supp. 2d 1060, 1073 (E.D. Tenn. 2011) (three incidents in two-month period of time not sufficient for *Monell* liability); *Harris v. City of Philadelphia*, 171 F. Supp.3d 395 (E.D. Pa. 2016) (three prior similar incidents sufficient to state plausible claim for *Monell* liability when *combined with* a DOJ report requested by the chief of police which detailed "numerous deficiencies" in the department's policies); *Boyd v. City of Warren,* No. 16-cv-12741, 2018 WL 1835704, at *2 (E.D. Mich. Apr. 18, 2018) (assuming three prior incidents of excessive force were sufficiently similar, but holding "three does not a pattern make"); *Ellis ex rel. Pendergrass v. Cleveland Mun. School Dist.*, 455 F.3d 690, 701 (6th Cir. 2006) (ten reports covering two-year period documented corporal punishment, but only two reports documented abuse rising to the level of the plaintiff's allegations; holding that to establish

18

deliberate indifference "through these reports, [the plaintiff] would have had to allege and put on some evidence that two incidents of abuse over two years is an excessive number"); *Burbridge v. City of St. Louis*, 430 F. Supp. 3d 595, 620-21 (E.D. Mo. Dec. 2019) ("Without determining exactly how many instances would suffice to show a pattern of misconduct, . . . [t]he Court finds that two or three incidents, occurring nearly a year apart and two years before any of the events at issue in this case, do not constitute a continuing, widespread, persistent pattern." (quotation marks and citation omitted)).

In *Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1989), the case Plaintiff relies on, a paraplegic inmate sued for deliberate indifference to his medical needs. During the first ten days of his time at the jail, he was not given an appropriate bed, he was left in his own urine for long periods of time, and he was denied aid for his bowel movements despite "his repeated requests for help." *Id.* at 1243. Although he "required particular attention to his cleanliness to avoid infection," he was not bathed for "several days." *Id.* In finding *Monell* liability was appropriate, the court reasoned that "at least 14 other paraplegics" received "similar deplorable treatment." *Id.* at 1247-48. In terms of giving notice to policymakers of unconstitutional actions, the sustained mistreatment of particularly vulnerable inmates in *Leach* plainly differs from the brief, isolated encounters involving excessive force which Plaintiff relies on in this case. *See Billingsley v. Shelby Cnty. Dep't of Corr.*, No. 02 2920 B, 2004 WL 2757915, at *4 (W.D. Tenn. Nov. 24, 2004) ("There may be claims of recklessness in some superiors not inquiring further into allegations against some officers. However, such failure to act in two unrelated cases, even if true, does not reflect a custom of conscious indifference to unconstitutional conduct.").

### b.    System to Investigate Uses of Force

Citing the deposition of Coffee County Sheriff Chad Partin, Plaintiff next argues that "the County has admitted that it did not have any system at all to investigate excessive force." [Doc. 44

19

p. 7-8]. Sheriff Partin testified that upon taking office on September 1, 2018, he implemented an Office of Professional Accountability ("OPA") to address problems driving lawsuits and complaints [Doc. 40-2 p. 4-6]. In response to the question, "And how is that different from the prior system, if you know?" Sheriff Partin testified, "There wasn't a prior system from what I was aware of." [Doc. 40-2 p. 6].

In its reply, Coffee County relies on Chief Deputy Watkins' affidavit which states that in fact there was a "system of investigating allegations of prisoner abuse," just not a formal office like the OPA [Doc. 50-1 ¶¶ 5-6]. Prior to Sheriff Partin establishing the OPA, allegations of prisoner abuse were investigated by first assigning any complaint to Lieutenant Rick Gentry or to an investigator in the detective division of the Coffee County Sheriff's Department [*Id*. at ¶¶ 5-7]. The "investigator assigned to the complaint would then look into the allegations by a variety of means, including but not limited to reviewing incident reports, investigating officers, investigating inmates, viewing video tapes, reviewing inmate kiosk activity, etc." [*Id.* at ¶ 7]. If "the investigator made a finding of a violation of policy or some other unlawful act," the finding "would be noted in the employee's personnel file and communicated to Chief Watkins, Lt. Gentry, or the Sheriff." [*Id*.]. If the investigator found the allegation unsubstantiated, however, no further action was taken [*Id*.]. Even viewing the facts in the light most favorable to Plaintiff, the proof shows there was a system in place for investigating complaints of misconduct/excessive force prior to Sheriff Partin establishing the OPA.

Accordingly, the Court finds Coffee County cannot be liable for any "custom of inaction," as Plaintiff has not shown "a clear and persistent pattern" of similar constitutional violations. *Garretson*, 407 F.3d at 796; *see also Claiborne Cnty.*, 103 F.3d at 508 (6th Cir. 1996). The Court finds the three incidents discussed above are not sufficient, even when they are considered in light of Sheriff Partin's testimony.

20

## 2.    Ratification of Illegal Actions

Plaintiff also appears to be pursuing a theory of liability based on jail officials' ratification of officers' use of excessive force.  To establish a ratification theory of liability, Plaintiff "may prove that the municipality has a pattern of inadequately investigating similar claims." *Stewart v. City of Memphis*, 788 F. App'x 341, 344 (6th Cir. 2019) (citations omitted).  To establish the existence of such a pattern, there must be "multiple earlier inadequate investigations and they must concern comparable claims." *Id.* at 344-45.  As explained above, Plaintiff has not shown the County failed to investigate multiple, comparable incidents of excessive force.

"Notwithstanding, a plaintiff would not need to establish a pattern of past misconduct where the actor was a policymaker with final policymaking authority." *Burgess*, 735 F.3d at 479 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-84 (1986)).[6]  On a single-act theory of *Monell* liability, "a plaintiff must demonstrate that a 'deliberate choice to follow a course of action is made from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question.'" *Id.* (quoting *Pembaur*, 475 U.S. at 483). Moreover, the course of action chosen or ratified by the policymaker "must be shown to be the moving force behind or cause of the plaintiff's harm." *Id.* (citing *Pembaur*, 475 U.S. at 484-85).

In this case, Plaintiff does not allege which official had final policymaking authority. Assuming Plaintiff's position is that the Sheriff had such authority, Plaintiff does not explain what deliberate choice the Sheriff made which resulted in Plaintiff's harm.  Plaintiff does not allege that the Sheriff directed the officers to attack Plaintiff using excessive force or that the Sheriff deliberately deleted (or ordered the deletion) of the video of the incident in order to condone the

---

[6] It is not clear that Plaintiff is actually pursuing this theory; however, the Court addresses it because Plaintiff argues there is "apparent ratification of the present case (including but not limited to the deletion of the video)" [Doc. 44 p. 8].

attack on Plaintiff or stifle any investigation into the incident. Plaintiff asserts that he requested the video be preserved multiple times, including via a letter to the Sheriff, and that "the lady who receives the Sheriff's mail attests that his letter was indeed put on his secretary's desk." [Doc. 40 p. 3]. This is not sufficient to subject Coffee County to *Monell* liability under a single-act theory. *See Burgess*, 735 F.3d at 479 ("In the instant case, Fischer did not order the takedown, nor do Plaintiffs assert that a course of action selected by Fischer was the moving force behind Burgess' injury. Fischer's after-the-fact approval of the investigation, which did not itself cause or continue a harm against Burgess, was insufficient to establish the *Monell* claim."); *see also Brown v. Chapman*, 814 F.3d 447, 462-63 (6th Cir. 2016) ("Plaintiff's ratification theory fails because . . . it requires that plaintiff make allegations against a specific final decisionmaker and plaintiff does not make those allegations.").

### 3.    Failure to Train/Supervise

The inadequacy of a training policy "may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of a person with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) (footnote omitted). Explaining this "deliberate indifference" necessary to support a claim of failure to train, the Supreme Court has stated:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390 (footnote omitted). To succeed on a claim for failure to train or supervise in the Sixth Circuit, Plaintiff must prove "'prior instances of unconstitutional conduct demonstrating that the

municipality had ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Wright v. City of Euclid*, 962 F.3d 852, 881 (6th Cir. 2020) (quoting *Burgess*, 735 F.3d at 478).

The Court reiterates Plaintiff has failed to show the requisite pattern of unconstitutional conduct. Moreover, Coffee County requires its officers to complete use of force training in accordance with TCI standards [Doc. 38-1 ¶ 5]. Officers are supervised by higher ranking individuals who oversee and direct compliance with TCI standards and Coffee County policies [*Id.* at ¶ 6]. Plaintiff has not presented any other evidence from which the Court could find that the training received by any officer in this case was in any way inadequate, and he has not demonstrated that there is a genuine issue of material fact that the training or supervision of the corrections officers caused the alleged assault on Plaintiff.

### 4.     Conclusion

In sum, the Court finds Plaintiff has failed to show that Coffee County had a policy or custom that caused the violation of his rights—either through an illegal official policy, a custom of tolerance/acquiescence, inadequate training/supervision, or ratification of illegal acts by a policymaker. *See Wright*, 962 F.3d at 879-80. The prior incidents Plaintiff lists are insufficient, even when combined with the deletion of the video of the subject incident, the alleged failure to investigate the subject incident, and the fact that there was not a formal office for investigating internal affairs prior to August 2018.

## III.     CONCLUSION

For the foregoing reasons, it is **ORDERED**:

1.     That Coffee County's motion for summary judgment [Doc. 38] is **GRANTED**;

2.     That Plaintiff's claims against Coffee County are **DISMISSED WITH PREJUDICE**; and

23

3.      That the Officer Defendants' motion for summary judgment [Doc. 37] is **DENIED**.

The Court will issue a separate order with trial-related deadlines and requirements for Plaintiff and the Officer Defendants.

**SO ORDERED.**

**ENTER**:

s/*Susan K. Lee*
_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE